

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-08-145-CV**


IN THE INTEREST OF J.W. AND N.W., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I.  Introduction

In six points, Appellant Teresa contests the sufficiency of the evidence to support the termination of her parental rights to J.W. and N.W.  We affirm.

### II.  Factual and Procedural History

Following a bench trial, Teresa's parental rights to her two children, J.W. and N.W., were terminated.  The trial court found that Teresa knowingly placed or knowingly allowed J.W. and N.W. to remain in conditions or surroundings

---

[1] *See* Tex. R. App. P. 47.4.

that endangered their physical or emotional well-being, that Teresa engaged in conduct or knowingly placed J.W. and N.W. with persons who engaged in conduct that endangered their physical or emotional well-being, and that termination would be in the best interest of the children. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2) (Vernon Supp. 2008).

The trial court reviewed the following events and circumstances when deciding to terminate Teresa's parental rights, including: (1) numerous referrals to the Texas Department of Family and Protective Services ("TDFPS") involving K.M. (Teresa's daughter by Ralph) and reports that Ron (J.W. and N.W.'s father and a convicted felon) physically abused K.M.; (2) Teresa's failure to take J.W. to the doctor for a follow-up after he had a gastrostomy tube ("g-tube") surgically implanted to allow food to be put directly into his stomach, even though she thought the procedure had failed; and (3) a November 8, 2006 incident involving a serious injury to N.W.

Teresa and Ron lived together, despite Ron's marriage to another woman. K.M. lived with Teresa and Ron in 2006, although Teresa later agreed to an order allowing K.M. to live with her father; K.M. is not the subject of this appeal. Ron worked part-time and watched the children while Teresa worked.[2]

---

[2] Ron voluntarily relinquished his parental rights to J.W. and N.W. just before the termination trial.

2

One day in 2004, K.M. scratched another child at school. Ron attempted to punish the child by scratching her on the arm. Someone reported this to TDFPS. After investigating the matter, TDFPS did not remove the child from Teresa's home; Teresa later acknowledged the inappropriateness of Ron's action.

J.W. was born September 12, 2003. He was diagnosed with failure to thrive and had digestive problems that caused him to projectile vomit. A g-tube was surgically implanted on October 24, 2006, to allow food to be inserted directly into his stomach. Teresa reported that the procedure did not work, but she did not take J.W. back to the doctor for over a year despite understanding that he was supposed to have returned for a follow-up after the surgery. Teresa justified her inaction by pointing out that an Early Childhood Intervention ("ECI") dietician was seeing J.W. and that she had no insurance at the time.

N.W. was born on September 30, 2006. Ron reported to his mother, Karen, that N.W. also had digestive problems. On November 8, 2006, Ron claimed that while he was carrying N.W. through his house at night in the dark, he tripped and N.W. fell from his arms, and when he tried to catch N.W., he was only able to grab N.W.'s leg. He called Teresa, who was at work, and told her that N.W. needed to go to the hospital. When she arrived home, she called her mother, who lived forty-five miles away, instead of calling Ron's mother

3

who was closer, to come and watch the other children while she and Ron took N.W. to the hospital. It took several hours after the alleged incident to get to the hospital and to get treatment for N.W. During the examination at the hospital, the doctor discovered that N.W.'s femur had a spiral fracture and, finding Ron's story highly suspicious, contacted TDFPS. The TDFPS worker at the hospital wrote in her report that Ron admitted:

- that he "did not know exactly what happened to the baby";

- that the "baby's head never hit his leg as he had reported";

- that he "did not know where he grabbed the baby";

- to "lying about some of the information provided to hospital staff";

- that "he had been rough with the baby the week before and had the [sic] check his fingers to make sure they were alright"; and

- that they were lucky that he didn't break the baby's neck as the injuries could have been much worse.

Nevertheless, Teresa stated that she believed that the injury was accidental and refused to consider the alternative. In the same report, the TDFPS worker described an interview with K.M., "who expressed great fear," began to cry, and asked if her parents were going to be able to see the videotape as she was scared. K.M. reported to the TDFPS worker that her parents had told her to lie and say only nice things about them when asked, "otherwise they were going

4

to be taken away from their mother." TDFPS placed all three of the children in foster care. Later, N.W. and J.W. were placed in the care of Ron's mother, Karen, and K.M. was placed in the care of her biological father.

Despite the doctor's concern that N.W.'s injury was not accidental, Teresa continued to live with Ron and unquestioningly accepted his version of events. Teresa and Ron visited N.W. and J.W., but the visits did not go well. Teresa and Ron paid attention to N.W. during the visits, but mostly ignored J.W., with Teresa exhibiting no emotion and little affection during the visits. While the two boys lived with Karen, Teresa and Ron provided little support for the two boys.

After removing Teresa's children, TDFPS developed a service plan, and later a revised plan, which Teresa completed in part. Pursuant to the plan, Teresa completed parenting classes, individual counseling, and a psychological evaluation. In addition, she attended an additional parenting course that was not listed on the service plan, and completed, on her own, a certification program that provided her job skills for a better paying job. On August 29, 2007, the caseworker presented Teresa with a revised service plan that included two additional tasks: couples counseling (with Ron) and a psychiatric evaluation. However, neither Teresa nor TDFPS was able to arrange for Teresa to complete these new tasks at times that would not conflict with her work

5

schedule. Teresa acquired suitable housing, beds, clothes, toys for her sons, stable employment, and through her employer, health insurance coverage for the children, who did not have any ongoing medical needs.

Meanwhile, N.W. and J.W. were doing well in Karen's care. Both had become healthy eaters, with J.W. having his g-tube removed. Karen arranged for K.M. to come to visit N.W. and J.W. regularly, so that they could maintain their sibling relationship and planned to adopt both boys if Teresa and Ron's parental rights were terminated. The trial court subsequently terminated Teresa's parental rights after Ron voluntarily relinquished his.

### III. Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to end them permanently — to

6

divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon Supp. 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the

reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (Vernon 2002).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on

8

the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that Teresa knowingly placed or knowingly allowed J.W. and N.W. to remain in conditions or surroundings that endangered their physical or emotional well-being or that Teresa engaged in conduct or knowingly placed J.W. and N.W. with persons who engaged in conduct that endangered their physical or emotional well-being, and that the termination of her parental rights would be in the best interest of the children. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108. If we reverse on factual sufficiency grounds, then we must detail in our opinion

9

why we have concluded that a reasonable fact-finder could not have credited disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266–67.

## IV. Endangerment

In her first and second points, Teresa asserts that the evidence is legally and factually insufficient to support the finding that Teresa engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. *See* Tex. Fam. Code Ann. § 161.001(1)(E). In her third and fourth points, Teresa asserts that the evidence is legally and factually insufficient to support the finding that Teresa knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children. *See id.* § 161.001(1)(D).

> Under section 161.001(1)(E) of the Texas Family Code, the term "endanger" means to expose to loss or injury, to jeopardize. Accordingly, when analyzing a jury's findings pursuant to subsection (E), we must determine whether sufficient evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. Termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct standing alone.

10

To determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. . . . [S]cienter is only required under subsection (E) when a parent places the child with others who engage in an endangering course of conduct.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.

*In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied) (citations omitted). Inappropriate or abusive conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *See Castorena v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-02-00653-CV, 2004 WL 903906, at *8 (Tex. App.—Austin Apr. 29, 2004, no pet.) (mem. op.); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1992, writ denied) (op. on reh'g); *see also In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) (stating that "environment" refers not only to the acceptability of living conditions, but also to the conduct in the home). Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we may conduct a consolidated review. *In re M.C.T.*, 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.)

11

The court had before it the following evidence:

- Teresa knew that Ron was a convicted felon but had not asked about the details of his criminal past.

- Ron was described as having a temper and had some psychiatric issues.

- Ron had not wanted children.

- Ron had scratched K.M. as punishment and had been suspected other times of physically abusing her.

- Teresa failed to take J.W. for his follow-up treatment following his g-tube surgery even though she believed that the surgery was not successful and even though J.W. still had "severe diarrhea."

- Teresa believed this inaction was justified because an ECI dietician was seeing J.W. and she did not have insurance for J.W. However, a dietician cannot act as a substitute for a doctor.

- More than a year passed from the time of the g-tube surgery until the time of the children's removal with no physician follow-up.

- N.W. was barely a month old when he was injured while in Ron's care.

- It took almost five hours before Teresa took him to the hospital and he was seen by a doctor who determined that N.W.'s femur had a spiral fracture.

- The doctor suspected intentional injury and contacted TDFPS.

- Teresa scheduled her supervised visits during her limited lunch hour and did not follow-up on an offer to reschedule some of the visits when she could have extra time.

- J.W. was ignored during the visits.

- Teresa did not provide support for the boys.

- Teresa failed to give N.W. a birthday present.

- Teresa brought J.W.'s present late.

- Karen offered to take J.W. and N.W. to Hawaii; Teresa refused to give her permission.

- Teresa failed to definitively state that she was going to leave Ron although she knew this would increase her chances of keeping her children, and Ron voluntarily relinquished his parental rights and invoked his Fifth Amendment right against self-incrimination.

- Teresa stated that she believed that Ron presented no danger to her children even though Ron had told the TDFPS investigator that:

    - that he "did not know exactly what happened to the baby";

    - that the "baby's head never hit his leg as he had reported";

    - that he "did not know where he grabbed the baby";

    - that he lied "about some of the information provided to hospital staff";

- that "he had been rough with the baby the week before and had the [sic] check his fingers to make sure they were alright"; and

- that they were lucky that he didn't break the baby's neck as the injuries could have been much worse.

Based on the foregoing evidence before the court and under the appropriate standard of review, we hold that the evidence is legally and factually sufficient to sustain the court's findings that Teresa knowingly placed or knowingly allowed J.W. and N.W. to remain in conditions or surroundings that endangered their physical or emotional well-being and that Teresa engaged in conduct or knowingly placed J.W. and N.W. with persons who engaged in conduct that endangered their physical or emotional well-being. We overrule Teresa's first four points.

## V. Best Interests

In her fifth and sixth points, Teresa asserts that the evidence is legally and factually insufficient to support the finding that termination of Teresa's parental rights is in the best interest of the children.

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex.

14

2006).  Nonexclusive factors that the trier of fact in a termination case may use

in determining the best interest of the child include:

> (1)    the desires of the child;
>
> (2)    the emotional and physical needs of the child now and in the future;
>
> (3)    the emotional and physical danger to the child now and in the future;
>
> (4)    the parental abilities of the individuals seeking custody;
>
> (5)    the programs available to assist these individuals to promote the best interest of the child;
>
> (6)    the plans for the child by these individuals or by the agency seeking custody;
>
> (7)    the stability of the home or proposed placement;
>
> (8)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and
>
> (9)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)

These factors are not exhaustive; some listed factors may be inapplicable

to some cases; other factors not on the list may also be considered when

appropriate.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just

one factor may be sufficient in a particular case to support a finding that

termination is in the best interest of the child.  *Id.*  On the other hand, the

15

presence of scant evidence relevant to each factor will not support such a

finding. *Id.*

The trial court had before it the following additional evidence:

- Teresa showed a lack of bonding to the boys and usually displayed a "flat affect."

- Teresa failed to help support the boys after their removal.

- Teresa continually put her own interests above those of J.W. and N.W. by remaining with Ron.

- Teresa failed to promptly and completely do the services requested by TDFPS; however, she did complete parenting classes, individual counseling, and a psychological evaluation, and she attended an additional parenting course that was not listed on the service plan and completed, on her own, a certification program that provided her with job skills for a better paying job.

- Teresa has found suitable housing and has acquired beds, clothes, and toys for her sons, but her home has previously been unstable, as she moved three or four times in the year after the boys were removed from her care.

- Teresa obtained stable employment and began a full-time job in September 2007 and, through her employer, is able to provide health insurance coverage for the children.

- Teresa's plans for the boys are vague as she seems to understand that she cannot support them alone in her current apartment based on her current wages.

- The boys are well-bonded to and happy living with their foster mom and paternal grandmother, Karen.

- The boys have become healthier in Karen's home, and Karen has made arrangements so that they can spend time with their half-sister, K.M.

- N.W. and J.W.'s emotional and physical needs have been best met by Karen.

- Karen plans to adopt the boys.

- Karen is currently providing for them without financial help from Teresa.

- Karen's home is stable and provides a "nurturing and loving environment for the boys."

- The children's CASA volunteer strongly recommended termination of the parents' rights and adoption by Karen.

Based on the foregoing evidence before the court and under the appropriate standard of review, we hold that the evidence is legally and factually sufficient to sustain the court's finding that termination was in the best interest of the children. We overrule Teresa's fifth and sixth points.

## VI. Conclusion

Having overruled all of Teresa's points, we affirm the trial court's judgment terminating Teresa's parental rights to J.W. and N.W.

BOB MCCOY
JUSTICE

PANEL: DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED: November 26, 2008